IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| versus | § | CRIMINAL NO. 4:23CR358-13 |
| | § | |
| JERREMY JAMES JENKINS | § | |

## MOTION TO SEVER DEFENDANT OR IN THE ALTERNATIVE SEVER COUNTS

Comes now Defendant Jerremy Jenkins (Jenkins) through undersigned counsel and respectfully requests the Court Sever Defendant or in the Alternative to Sever Counts and for good cause will show the following:

### I.       INTRODUCTION AND RELIEF REQUESTED

The superseding indictment charges thirteen defendants in a robbery and drug conspiracy involving controlled substance "rips" and two homicides. Counts Six through Eleven allege two murders in aid of racketeering, firearm discharges during drug trafficking and crimes of violence, and causing death through use of a firearm, all tied to a July 19, 2023 home invasion. Only three defendants are charged in those homicide-related counts: Derrick Butler, Christian Rucker, and Jermar Jones.

Defendant Jenkins is charged only in the two global conspiracy counts (Counts One and Two) and a single controlled "robbery sting" on July 27, 2023

(Counts Twelve and Thirteen), where agents admit he never entered the structure, never brandished or possessed a firearm, and was not even known to law enforcement before that day. The government's own detention witness, Detective/TFO Adam Bock, testified that Jenkins was not in the hotel planning meeting, was only seen changing cars and riding along, and was released at a traffic stop after officers found no weapons and chose not to arrest him. (See Doc. 56 – Detention Hearing Transcript).

The same government now asks this Court to try Defendant next to three co-defendants facing life sentences for two homicides. Its unopposed motion to certify this case as complex openly acknowledges that the trial will be dominated by double-murder evidence, including medical examiner testimony, crime-scene and autopsy photographs, ballistics, DNA, cell-phone analysis, and other highly charged proof that has nothing to do with Jenkins. For him, almost none of that "significant amount of evidence" will be admissible or relevant. (See Doc. 186 – Motion to Certify as Complex).

Under Rule 14, this Court can and should sever Defendant. Jenkins respectfully asks for a separate trial on Counts One, Two, Twelve, and Thirteen, or, at minimum, a separate trial from the three homicide defendants.

## II.    RELEVANT BACKGROUND

A.    INDICTMENT AND DEFENDANT'S CHARGES

The superseding indictment alleges a "Robbery Crew" enterprise that committed armed robberies of drug dealers and associated drug trafficking. Count One charges all thirteen defendants in a Hobbs Act robbery conspiracy between April 14 and August 25, 2023. Count Two charges all thirteen in a drug-trafficking conspiracy involving at least five kilograms of cocaine and marijuana.

Defendant appears only in these global conspiracies and in the July 27, 2023 controlled sting:

- Count One – Conspiracy to interfere with commerce by robbery, 18 U.S.C. § 1951(a). The indictment alleges a general agreement to rob drug traffickers and steal narcotics and drug proceeds.

- Count Two – Conspiracy to possess with intent to distribute controlled substances, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), 841(b)(1)(D), 846. The indictment alleges that all defendants knew the conspiracy involved at least five kilograms of cocaine.

- Count Twelve – Attempt to possess with intent to distribute at least five kilograms of cocaine on July 27, 2023, in a controlled robbery sting at an abandoned golf course pump house. This count names Butler, Maxwell, Winnfield, Mitchell, Draper, and Jenkins.

- Count Thirteen – Possession of a firearm in furtherance of a drug-trafficking crime arising from the July 27 sting, 18 U.S.C. § 924(c). This count again names Butler, Maxwell, Winnfield, Mitchell, Draper, and Jenkins.

Doc. 113 – Superseding Indictment.

By contrast, Jenkins is not charged in any of the following homicide-related counts:

- Count Six – Murder in Aid of Racketeering (Eduardo Ayala Salgado), 18 U.S.C. § 1959(a)(1).

- Count Seven – Using a firearm during a drug-trafficking crime, discharged, 18 U.S.C. § 924(c)(1)(A)(iii).

- Count Eight – Using a firearm during a crime of violence (VICAR murder), brandished and discharged, 18 U.S.C. § 924(c)(1)(A)(ii)–(iii).

- Count Nine – Causing death through use of a firearm (Ayala Salgado), 18 U.S.C. § 924(j)(1).

- Count Ten – Murder in Aid of Racketeering (Demarcus Edwards), 18 U.S.C. § 1959(a)(1).

- Count Eleven – Causing death through use of a firearm (Edwards), 18 U.S.C. § 924(j)(1).

Counts Six through Eleven name only Butler, Rucker, and Jones. *Id.* at 7–13. Those counts are death-eligible and carry potential life sentences. *Id.*

B.    GOVERNMENT'S COMPLEX CASE MOTION

The government's unopposed motion to certify this case as complex admits this will be a homicide-heavy, resource-intensive trial. The motion describes:

- "Counts Six through Eleven involve a July 19, 2023, armed home invasion of a drug house … that resulted in two homicides."

- "Counts Six and Ten each charge murder in aid of racketeering … punishable by not less than life imprisonment, up to the death penalty."

- "Counts Nine and Eleven charge causing death through the use of a firearm … punishable by not less than 10 years' imprisonment (consecutive) up to life or the death penalty."

Doc. 186 – Motion to Certify as Complex.

The government further explains that this prosecution "involves a double homicide," the "extensive use of audio and video recorded meetings and surveillance," and "more than 120,000 pages in discovery, [plus] substantial video, audio, and physical evidence." It intends to call "cellular telephone expert analysts from the FBI, firearms experts from ATF, findings from the Harris County Medical Examiner, [and] significant DNA evidence," along with witnesses from various state and federal agencies. *Id*. at pp. 2–4.

None of that death/life-eligible, homicide-driven case has anything to do with Jenkins. He is not alleged to have been present at the July 19 home invasion, to have

fired a weapon, to have participated in any homicide, or to have known about the murders.

## C.    GOVERNMENT WITNESSES

The detention hearing record underscores how limited the evidence is against Jenkins. The FBI's gang investigation began with an early 2023 focus on the "Early Boys Scoot up" gang and on defendant Travon Maxwell's involvement in "drug rips and robberies of rival gang members." See Doc. 56, at 11. A confidential human source contacted Maxwell on July 24, 2023 and discussed a "rip" of a purported cartel shipment. *Id*. at 11–12. Those discussions involved Maxwell and Butler, not Jenkins.

Detective/TFO Bock's proffer and testimony confirm that:

- The July 27 hotel meeting at the Residence Inn was attended by Maxwell, Butler, a fugitive, and an unidentified male. Jenkins was not inside the room. *Id*. at 11–13, 30–31.

- Jenkins was not part of the earlier July 26 meeting. *Id*. at 22–23.

- Jenkins was later observed in the parking lot getting into a gray Dodge Charger with co-defendant Draper, after others had already planned the robbery. *Id*. at 31–32, 44.

- The convoy traveled to the abandoned golf course. Maxwell's red Camry, with four armed men, entered the property and those men—Maxwell,

Mitchell, a fugitive, and another male—kicked in the pump house door wearing masks, gloves, and carrying long guns and handguns with extended magazines. *Id*. at 15–16. Jenkins was not among them.

- Draper's Charger, with Jenkins as a passenger, remained first at a 7-Eleven, then later drove onto the property but "stopped before reaching the pump house." Bock did "not believe" anyone got out. *Id*. at 17, 33–34.

- Houston police later stopped Draper and Jenkins's Charger. Draper was patted down; Jenkins was not even removed from the vehicle. The car was not searched, and both men were released at the scene. *Id*. at 17, 33–38.

In short, as Agent Bock conceded, Jenkins' apparent "role" was limited to riding in a car that never reached the pump house, never unloading any drugs, and leaving when the others discovered there was no cocaine. *Id*. at 33–34. There is no evidence that Jenkins possessed a gun, entered the structure, threatened anyone, or even understood the full scope of the scheme. Based on the same testimony the government will rely on at trial, Jenkins stands in a very different posture than the lead defendants, particularly the three men charged with two VICAR murders.

## III.   LEGAL STANDARDS

A.   JOINDER

Federal Rule of Criminal Procedure 8 allows joinder of defendants indicted together, particularly where they are alleged to have participated in the same

conspiracy. F.R.Cr.P Rule 14 squarely recognizes, however, that even proper joinder under Rule 8 sometimes produces unfairness. Rule 14(a) provides that "[i]f the joinder of offenses or defendants in an indictment … appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

The Fifth Circuit has repeatedly held that severance is the exception and that a defendant seeking severance faces a "doubly high burden." *United States v. Ledezma Cepeda*, 894 F.3d 686, 690 (5th Cir. 2018); *United States v. Daniel*, 933 F.3d 370, 380–81 (5th Cir. 2019); *United States v. Age*, 136 F.4th 193, 246–47 (5th Cir. 2025).

The general rule is that "defendants who are indicted together should be tried together," particularly "in conspiracy cases." *Daniel*, 933 F.3d at 380; *United States v. Musquiz*, 45 F.3d 927, 931 (5th Cir. 1995). Severance is proper "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

To "surmount this heavy presumption," the defendant must show that: (1) the joint trial prejudiced him "to such an extent that the district court could not provide adequate protection," and (2) the prejudice outweighed the government's interest in judicial economy. *Daniel*, 933 F.3d at 380–81 (citing *United States v. Snarr*, 704

F.3d 368, 396 (5th Cir. 2013)). Generic allegations of spillover are not enough; the defendant must identify "specific compelling prejudice." *United States v. Lewis*, 476 F.3d 369, 383–84 (5th Cir. 2007).

But the Fifth Circuit has also made clear that there are rare, "extraordinary situations" where the prejudice is so severe that no limiting instruction can cure it and severance is required. See *United States v. Erwin*, 793 F.2d 656, 665–66 (5th Cir. 1986); *United States v. Cortinas*, 142 F.3d 242, 248–249 (5th Cir. 1998); *United States v. McRae*, 702 F.3d 806, 822–828 (5th Cir. 2012). This is one of those rare cases.

B.    SEVERANCE EXCEPTIONS

Even though joint trials are the norm, the Fifth Circuit has consistently recognized a narrow category of cases where severance is not just appropriate but necessary. Those are the cases where a defendant sits through a trial dominated by violent, emotional, or otherwise "mountainous" evidence that does not apply to him. When that happens, the prejudice is so deep that no instruction can cure it, and the jury cannot realistically make a reliable judgment about guilt. Jenkins falls squarely within that line of cases.

In *Erwin*, 793 F.2d 656, the Fifth Circuit reversed a conviction where a peripheral defendant was forced to sit through evidence of kidnappings, beatings, and a killing that had nothing to do with her. The court considered a large RICO and

drug conspiracy trial that involved evidence of "two kidnappings, two beatings and one killing" as well as tax evasion and money laundering. *Id.* at 665–66. Grace Davis was a peripheral defendant charged only with perjury. The court acknowledged the general preference for joint trials, but found that Davis's case was different:

> The charges against her were already only peripherally related to those alleged against the other appellants. As the trial progressed, it became increasingly apparent that very little of the mountainous evidence was usable against her, and almost none of it applied directly. The prejudice she suffered from the joint trial, then, far outweighed any benefit of judicial economy.

*Id.* at 666.

The Fifth Circuit held that the district court abused its discretion in denying Davis' renewed severance motion at the close of evidence and reversed her convictions. *Id.*

The Fifth Circuit reached the same result in *Cortinas*, 142 F.3d 242. The court confronted a multi-defendant marijuana conspiracy involving a violent motorcycle gang, the Bandidos. The Bandidos later joined the conspiracy and carried out a drive-by shooting in Michigan that killed a 14-year-old boy. Two defendants, Rodriguez and Mata, had ceased their involvement years before the Bandidos joined. They were never associated with the gang and had no connection to the shooting. *Id.* at 247–49.

The court held that the trial judge abused his discretion in denying severance because the "highly inflammatory evidence" of the motorcycle gang's tactics and the Michigan shooting had nothing to do with Rodriguez and Mata, and the limiting

instructions were "inadequate to mitigate the prejudicial effect of the overwhelming testimony regarding the violent, criminal activities of the Bandidos." *Id*. at 248. The Fifth Circuit vacated their convictions and remanded.

In *McRae*, 702 F.3d 806, New Orleans police officers were tried together on various charges arising from the Henry Glover shooting after Hurricane Katrina. Officer Warren was charged only with unlawfully shooting Glover. His co-defendants, McRae and McCabe, were charged with burning Glover's body in a car and engaging in a cover up and obstruction. The evidence against McRae and McCabe included gruesome photos of the burned remains, testimony about desecration of the corpse, racially charged language, and alleged attempts to falsify reports. Warren was not charged in any of those counts. The Fifth Circuit held that the denial of severance as to Warren was reversible error:

> Very little of the 'mountainous evidence,' including evidence of two kidnappings, two beatings, and one killing, 'was usable against [Davis],' and almost none of it applied directly.' … Here, the charge against Warren—that he acted unlawfully in shooting Glover—was only tangentially relevant to McRae's alleged ghoulish crime of obstruction related to Glover and the alleged cover up charged against McCabe. Indeed, McRae and McCabe could have been convicted even if Warren had been found innocent, and as the trial progressed it became increasingly apparent that very little of the evidence of the alleged cover-ups was properly usable against Warren, and that almost none of it applied directly to him.

*Id*. at 822–23 (quoting Erwin, emphasis added).

The court went on to emphasize that the "severely emotional nature" of the evidence and photographs, and the government's tendency to blur the roles of the different defendants in closing argument, created such a spillover effect that limiting instructions could not cure the prejudice. *Id*. at 826–28. Warren's conviction was vacated and remanded for a new trial.

In *United States v. Ashley*, 128 F.4th 641 (5th Cir. 2025), the Fifth Circuit reaffirmed that severance becomes necessary when the government relies on evidence that unfairly "bolsters" a weak case against a particular defendant. The court recognized that misjoinder or spillover can violate a defendant's right to a fair trial when the government uses counts or co-defendants with dramatic or inflammatory evidence to "shore up" thin proof on other charges. *Id*.

Put together, these cases create a clear standard: when the trial will be dominated by violent or emotionally charged evidence that has nothing to do with the movant, and when the government risks using that evidence to support a much thinner case against him, severance is required.

## IV.   APPLICATION

When the facts of this case are placed against the backdrop of *Erwin, Cortinas, McRae,* and *Ashley*, the conclusion is simple: Jenkins fits squarely within the narrow category of defendants the Fifth Circuit has said must be severed. Each of those cases involved a peripheral defendant forced to sit through a trial dominated by violent,

emotional, or inflammatory evidence that had nothing to do with them. The same is true here, but the prejudice is even more pronounced.

Jenkins is not charged in the July 19 double homicide. He is not alleged to have planned it, participated in it, known about it, or benefitted from it. He was not present. He did not possess a gun. Agents testified he never entered the pump house on July 27, never brandished a weapon, and was not even known to law enforcement before that day. His alleged conduct begins and ends with being a passenger in a car that never reached the scene of the controlled sting. That limited posture places him in the same category as Davis in *Erwin*, Rodriguez and Mata in *Cortinas*, and Warren in *McRae*: a defendant whose charges are "only peripherally related" and whose trial would be dominated by "mountainous evidence" irrelevant to him.

The comparison to *Erwin* is direct. The Fifth Circuit emphasized that Davis sat through evidence of kidnappings, beatings, and a killing that "almost none of it applied directly" to her. The same is true here. Jenkins would be forced to sit beside three men accused of murdering two individuals during a home invasion and face a jury that listens to autopsy testimony, views graphic photographs, and hears from forensic experts regarding ballistics, DNA, and cell-site mapping—all for crimes he is not charged with and had no role in. As in *Erwin*, this evidence will consume the trial. And as *Erwin* held, when "very little of the mountainous evidence [is] usable

against [the defendant]," the prejudice outweighs judicial economy and severance becomes mandatory.

*Cortinas* reinforces the need for severance because, like Rodriguez and Mata, Jenkins' alleged involvement is not included in the most inflammatory acts. Rodriguez and Mata were not part of the Bandidos gang when the Michigan shooting occurred, and the Fifth Circuit found it fundamentally unfair to expose them to evidence of gang murders they had nothing to do with. Jenkins occupies that same position, except even more starkly.

The government admits agents did not even know Jenkins' name until July 27. There is no allegation he joined the "Robbery Crew" before the double homicide, no allegation he ever knew about the homicide, and no evidence tying him to the July 19 events. Under *Cortinas*, exposing him to homicide evidence that is "highly inflammatory" and "overwhelming" is the exact prejudice Rule 14 was designed to avoid.

*McRae* is perhaps the closest parallel. Warren's charge was limited to an allegedly unlawful shooting, yet he was tried beside officers accused of burning a body, hiding evidence, and falsifying reports. The Fifth Circuit called the evidence against the co-defendants "ghoulish," "severely emotional," and so distinct from Warren's conduct that no instruction could cure the spillover.

That is exactly this case. The government intends to show the jury burned-body-level emotional evidence (graphic autopsy photos, medical examiner findings, crime-scene conditions, high-intensity forensic proof) all connected to co-defendants facing life sentences. Jenkins' minor, non-violent allegations have the same tenuous relationship to that evidence as Warren's conduct in *McRae*. If anything, Jenkins' position is even more questionable because there is no allegation he ever fired a shot or even held a gun.

Finally, *Ashley* shows how the government's trial strategy amplifies prejudice. The Fifth Circuit warned that when the government uses emotionally charged evidence to "bolster" a weak case against a peripheral defendant, severance becomes necessary. That is analogous to what will happen here.

The detention transcript shows a thin case against Jenkins: no planning, no presence in the pump house, no gun, no direct statements, and only a ride-along with someone who backed away. Against that background, injecting two VICAR murders, death/life eligible counts, autopsies, DNA, and the narrative that the "Robbery Crew" kills to maintain its power is the very kind of unfair bolstering *Ashley* condemns. Jenkins will be judged not for what he did, but for the violence of others.

Taken together, these cases demonstrate that the prejudice to Jenkins is not theoretical or speculative. It is concrete, foreseeable, and unavoidable. He will be

tried next to men accused of murdering two people in a home invasion, with the government's own filings making clear that the trial will be dominated by homicide proof. The jury will hear one sweeping "Robbery Crew" narrative and inevitably attribute the violence of the lead defendants to every defendant at counsel table. No limiting instruction can un-ring that bell.

Under *Erwin*, *Cortinas, McRae,* and *Ashley*, this is the rare, extraordinary case where severance is not merely appropriate, it is required to ensure Jenkins receives a fair trial.

## V.    THIS COURT'S RULINGS SUPPORT SEVERANCE

Two recent severance rulings from this Court, *United States v. Fisch*, No. H-11-722, 2014 U.S. Dist. LEXIS 91553 (S.D. Tex. July 7, 2014) and *United States v. Mokbel*, No. H-21-103, 2024 U.S. Dist. LEXIS 34974 (S.D. Tex. Feb. 29, 2024), illustrate why severance is required here rather than foreclosed.

Both cases involved this Court applying the Fifth Circuit's unsettled but consistent standard: joint trials are favored, but there remains a small category of "extraordinary situations" in which the risk of undue prejudice is so significant that no cautionary instruction can cure it. What matters for this motion is that neither *Fisch* nor *Mokbel* presented anything close to the kind of violent, emotionally charged, homicide evidence present in this case. Those opinions do not weaken the Rule 14 argument for Jenkins; they sharpen it.

*Mokbel* was a healthcare-fraud conspiracy with financial records, business communications, and actuarial-type evidence. This Court denied severance because the disparity in proof was nothing more than the usual complexity that accompanies a multi-defendant white-collar case. The Court stressed that spillover from a larger evidentiary footprint does not justify severance unless the prejudice is "clearly beyond the curative powers of a cautionary instruction." *Mokbel*, 2024 WL 874121, at *4. The Court also emphasized that the conspiracy was "neither so vast nor so complex" that a jury could not compartmentalize the proof. None of the evidence was violent, graphic, death/life eligible, or emotionally incendiary.

The same is true for *Fisch*. That was another fraud-based prosecution, and the Court again relied on the Fifth Circuit's routine rule that differences in the volume of evidence do not justify severance. But in *Fisch*, the Court expressly distinguished the very cases Jenkins relies on (*Erwin, Cortinas,* and *McRae*) as involving the kind of highly inflammatory, violent evidence that overwhelms a peripheral defendant. Nothing in Fisch involved death, homicide, autopsies, violent assaults, or anything remotely like the homicide evidence the government says will dominate this trial.

This case is fundamentally different. The government has already told the Court that the trial will center on two VICAR murders, autopsy findings, medical-examiner testimony, crime-scene and wound photographs, forensic reconstruction, firearms analysis, DNA, and gang-style homicide evidence. Those

are death/life eligible offenses. Jenkins is not charged in any of them. He is not alleged to have been present. Agents did not know his name until after the homicides. He never carried a gun, entered the house, or discussed violence. Sitting him beside defendants facing life or death for a double homicide is not the evidentiary disparity the Court handled in *Fisch* or *Mokbel*; it is the precise "extraordinary situation" the Fifth Circuit described in *Erwin, Cortinas,* and *McRae*.

Thus, this Court's own decisions reinforce the need for severance here. Jenkins faces evidence qualitatively different from anything presented in *Fisch* or *Mokbel*. This is exactly the kind of "extraordinary" case where Rule 14 requires severance.

## VI.    REQUESTED RELIEF

For all these reasons, this is one of the "relatively few cases" in which the Fifth Circuit has recognized that severance is required to avoid specific and compelling prejudice. Jenkins respectfully requests that the Court Order that he be tried separately from co-defendants Butler, Rucker, and Jones, who are charged in the homicide counts, and set his case (Counts One, Two, Twelve, and Thirteen) for a separate trial.

In the alternative, if the Court declines to fully sever Jenkins' trial, he asks that the Court at least sever the homicide counts (Counts Six through Eleven) and

try those charges separately from the non-homicide counts involving Jenkins, so that the jury deciding his case is not exposed to the most inflammatory evidence.

Respectfully submitted,

*/s/ Raymundo J. Vazquez*
Raymundo J. Vazquez
State Bar of Texas: 24094996
Federal Bar: 2600981
1620 S. Friendswood Dr.
Suite 288A
Friendswood, TX 77546
(832) 343-8023

*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I, Raymundo J. Vazquez, certify that a true and correct copy was delivered to the Government and current counsel via email on February 2, 2026.

*/s/ Raymundo J. Vazquez*

Raymundo J. Vazquez

## CERTIFICATE OF CONFERENCE

I, Raymundo J. Vazquez, have conferred with counsel for the Government and he is OPPOSED to this motion.

*/s/ Raymundo J. Vazquez*

Raymundo J. Vazquez